## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| HEATHER BARTHEL, on behalf of T.M.B., a minor,<br><br>           Plaintiff,<br><br>vs.<br><br>MICHAEL J. ASTRUE,<br>Commissioner, Social Security<br>Administration,<br><br>           Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)   Case No. CIV-08-60-L<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### REPORT AND RECOMMENDATION

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of the Social Security Administration denying her child's application for supplemental security income benefits. United States District Judge Tim Leonard has referred the matter to the undersigned Magistrate Judge for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B). The Commissioner has answered and filed the administrative record (hereinafter Tr. __). As the parties have briefed their positions, the matter is at issue. For the following reasons, it is recommended that the Commissioner's decision be reversed, and that the matter be remanded for further proceedings.

### I. PROCEDURAL HISTORY

Plaintiff protectively filed an application for supplemental security income benefits on behalf of her minor son, T.M.B., on January 23, 2004, alleging a disability onset date of May 15, 1998, caused by Attention Deficit Hyperactivity Disorder ("ADHD"). Tr. 49-51,

54. The application was denied on initial consideration and on reconsideration at the administrative level. Tr. 31-32, 38-41, 43-46. Pursuant to Plaintiff's request, a hearing was held before an administrative law judge on September 11, 2006. Tr. 37, 191-219. Plaintiff appeared in person with T.M.B. and a non-attorney representative, and both she and T.M.B. offered testimony in support of the application. Tr. 193, 198-205, 205-218. The administrative law judge issued his decision on February 16, 2007, finding that T.M.B. was not disabled within the meaning of the Social Security Act, and therefore not entitled to benefits. Tr. 12-14, 15-26. The Appeals Council denied Plaintiff's request for review on September 24, 2007, and thus the decision of the administrative law judge became the final decision of the Commissioner. Tr. 7-9.

## II. STANDARD OF REVIEW

The Tenth Circuit Court of Appeals has summarized the applicable standard of review as follows:

> [W]e[1] independently determine whether the [administrative law judge's] decision is "free from legal error and supported by substantial evidence." Although we will "not reweigh the evidence or retry the case," we "meticulously examine the record as a whole, including anything that may undercut or detract from the [administrative law judge's] findings in order to determine if the substantiality test has been met."
>
> "Substantial evidence is such relevant evidence as a reasonable mind might

---

[1] Although the Tenth Circuit Court of Appeals was discussing its own standard of review, the same standard applies to the federal district court's appellate review of social security cases. Hamilton v. Sec'y of Health & Human Servs., 961 F.2d 1495, 1502 n. 1 (10th Cir. 1992) ("as the second-tier appellate court, a circuit court does apply the same standard of review as the district court-the standard applicable to appellate review of individual social security cases").

> accept as adequate to support a conclusion. It requires more than a scintilla, but less than a preponderance." Our determination of whether the [administrative law judge's] ruling is supported by substantial evidence "must be based upon the record taken as a whole." Consequently, we remain mindful that "[e]vidence is not substantial if it is overwhelmed by other evidence in the record."

Wall v. Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009) (citations omitted).

### III. FRAMEWORK FOR DETERMINING CHILDHOOD DISABILITY

A child is considered "disabled" if he has "a medically determinable physical or mental impairment or combination of impairments that causes marked and severe functional limitations, and that can be expected to cause death or that has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.906. Agency regulations outline a three-step sequential evaluation process that an administrative law judge must follow in determining whether a child is "disabled" within the meaning of the Social Security Act. Briggs ex rel. Briggs v. Massanari, 248 F.3d 1235, 1237 (10th Cir. 2001). First, the administrative law judge determines whether the child has engaged in substantial gainful activity since the alleged onset date. 20 C.F.R. § 416.924(a). If the child has not engaged in substantial gainful activity, the administrative law judge must next determine whether the child has a severe, medically determinable impairment. Id. If the child has a severe, medically-determinable impairment, the administrative law judge must then determine whether the impairment or combination of impairments meets, medically equals, or functionally equals any of the "listings" of impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1. Id.; 20 C.F.R. § 416.924(d).

In determining whether a child's impairment functionally equals a listed impairment, an administrative law judge must consider how the child functions in each of six "domains." "Domains" are defined as "broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1). The six domains pertaining to childhood disability claims are (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for oneself, and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). A child's impairment is deemed to be the functional equivalent of a listed impairment if the impairment causes extreme functional limitation in one domain or marked functional limitation in two or more domains. 20 C.F.R. § 416.926a(d).

## IV. THE ADMINISTRATIVE LAW JUDGE'S DECISION

In determining that T.M.B. was not disabled, the administrative law judge followed the sequential evaluation process set forth in 20 C.F.R. § 416.924. Tr. 15-17. He first found that T.M.B. had not engaged in substantial gainful activity at any time relevant to the decision, and so he proceeded to the next step in the sequential analysis. Tr. 18. At the second step, the administrative law judge concluded that T.M.B. suffers from the severe impairment of Attention Deficit Hyperactivity Disorder, combined type. Tr. 18. However, at the third step, the administrative law judge concluded that T.M.B. does not have an impairment or combination of impairments that meets or medically or functionally equals one of the impairments listed in 20 C.F.R. Part 404, Appendix 1, Subpart P, Social Security Regulations, No. 4. Tr. 18. As to the relevant domains, the administrative law judge

concluded that T.M.B. had no limitation in acquiring and using information; less than marked limitation in attending and completing tasks; less than marked limitation in interacting and relating with others; no limitation in moving about and manipulating objects; no limitation in the ability to care for himself; and no limitation in his health and physical well-being. Tr. 20-26. Accordingly, the administrative law judge found that T.M.B. does not have an impairment or combination of impairments that result in either "marked" limitations in two domains of functioning, or "extreme" limitation in one domain of functioning, and therefore concluded that T.M.B. is not disabled and he denied the application. Tr. 26.

## V. PLAINTIFF'S ARGUMENTS ON APPEAL

Plaintiff raises three issues for judicial review. She first claims that the administrative law judge committed legal error by failing to properly explain his finding that T.M.B.'s ADHD did not meet or medically equal the criteria of the ADHD listing. Plaintiff's Opening Brief, p. 13. Plaintiff next argues that the administrative law judge's findings that T.M.B. had "less than marked" limitations in attending and completing tasks and in interacting and relating with others were legally insufficient and not supported by substantial evidence. Id. at 19. Finally, Plaintiff contends that the administrative law judge legally erred by failing to follow correct standards in evaluating the circumstances surrounding T.M.B.'s medication usage. Id. at 27.

## VI. MEDICAL AND OTHER EVIDENCE

The record shows that Dr. Jerry Dodson with the Northwest Center for Behavior Health performed a psychiatric diagnostic evaluation of T.M.B. on March 5, 2003, when

T.M.B. was four and a half years old. T.M.B.'s mother described his problems as "get[ting] in trouble a lot in day care," not listening, being "ugly" to his grandmother, and having "a really short attention span." Tr. 174. T.M.B. was reported to be fighting with another child who was previously his best friend, and refused to obey his mother and grandmother. Tr. 174. There were no concerns about T.M.B.'s intelligence, but there were concerns that he was poorly focused, had a short attention span, was highly distractable, and was hyperactive, and impulsive. Tr. 175. During the mental status exam, Dr. Dodson found T.M.B. to have slightly increased psychomotor activity along with impaired impulse control and judgment by history. However, Dr. Dodson found T.M.B. to be alert and cooperative with a normal speech rate and tone, intact sensorium, euthymic mood, and an affect congruent with his mood. T.M.B.'s immediate retention and recall, and remote and recent memory were all described as good. T.M.B.'s thought processes were coherent, sequential, and productive, and his intellect was in the normal range of function. Tr. 175. Dr. Dodson diagnosed T.M.B. with ADHD, combined type. T.M.B.'s current and highest GAF in the past year were assessed at 50.[2] Dr. Dodson prescribed Adderall and recommended that T.M.B. return in one month for coordination of his care. Tr. 175. In April 2003, it was reported that the effectiveness of the Adderall prescribed for T.M.B. wore off in the early afternoon. Tr. 173.

---

[2] The GAF is a subjective determination based on a scale of 100 to 1 of "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000) at 32. A GAF score of 41-50 indicates "serious symptoms. . . [or] serious impairment in social, occupational, or school functioning . . . ." Id. at 34.

Therefore, for April through June of 2003, Dr. Dodson prescribed Concerta and Clonidine to treat T.M.B.'s ADHD. Tr. 172-73.

Plaintiff took T.M.B. to see Dr. Tana Settle for ADHD evaluation in September 2003. Tr. 126-130. Plaintiff reported to Dr. Settle that T.M.B. had been taking Concerta and Clonidine and that she believed Concerta was the most effective in treating T.M.B.'s ADHD, but that it made him a "zombie." Tr. 130. She indicated that T.M.B. ran out of medication at school and that she noticed a difference. Tr. 130. On an assessment form completed in September 2003, Plaintiff reported that T.M.B. displayed behavioral symptoms "often" or "very often" in several categories, and that his performance in many categories was "average" to "problematic." Tr. 128. She noted that T.M.B. had not been eating, was crying frequently, was being disobedient, and was biting his fingernails and picking his skin, all of which had become worse since his grandmother's recent death. Tr. 129. T.M.B. had recently been "talking about getting knives [and] hurting himself," which prompted Plaintiff to have him evaluated. Tr. 126. T.M.B. was noted to display 18 of 18 symptoms of ADHD, combined inattention/hyperactivity, and he was scheduled for a follow-up visit in one month. Tr. 126-27. At a November 2003 follow-up appointment, Plaintiff reported to Dr. Settle that T.M.B. was "doing good" on Concerta, but noted that he had been without medication, Concerta and Risperdal, for approximately three weeks, and she had noticed a difference. Tr. 118.

On December 23, 2003, Plaintiff took T.M.B. to Dr. Nicholas Bentley, an osteopath, because he was having problems at school. Tr. 138. Dr. Bentley increased T.M.B.'s

7

Concerta dosage. Tr. 138. T.M.B. again visited Dr. Bentley on March 23, 2004, regarding his medication because he was having problems at school and daycare. Tr. 135. Dr. Bentley ordered T.M.B. to discontinue Concerta in four days and prescribed Strattera instead. Tr. 135. On April 5, 2004, T.M.B. was reported to do "best" on Strattera. Tr. 134. Approximately one week later T.M.B. visited Dr. Bentley because he was violent on Concerta, and Dr. Bentley ordered the immediate cessation of Concerta and a psychological evaluation. Tr. 133.

Accordingly, Dr. William Kleinpeter, a clinical psychologist, and Priscilla Kleinpeter, a licensed marriage and family therapist, evaluated T.M.B. on August 4, 2004, when he was six years old. Tr. 140. T.M.B. was observed to be "extremely restless and motor driven" at the examination. Tr. 140. T.M.B.'s activities of daily living were recorded to include dressing and grooming independently, playing with toys, watching cartoons, playing outside, brushing his own teeth, getting himself something to drink, taking out the trash, and completing age-appropriate household chores. Tr. 141. T.M.B.'s mother described his social functioning as "bossy and aggressive" with peers and his frustration tolerance as "poor," which required him to have close supervision. Tr. 142. As to T.M.B.'s ability to complete tasks timely and appropriately, it was noted that T.M.B.'s attention and concentration were extremely poor, that he had to be touched on the hand and re-cued after almost every question, and that he required firm direction and constant supervision. Tr. 142.

During the mental status exam, T.M.B. was "extraordinarily restless, hyperactive, and distractible," and spoke in complete and complex sentences that were coherent and relevant.

Tr. 142. T.M.B. displayed no evidence of hallucinations, delusions, or psychotic thinking, and his mood and affect were characterized as having the "artificial cheerfulness sometimes seen with children diagnosed with ADHD." Tr. 143. T.M.B.'s affect was unchanging, and he reported activities he enjoyed, noted that he got mad easily, but denied feelings of sadness or particular fears and had no thoughts of harming himself or others. Tr. 143. The examiners noted that T.M.B.'s concentration was "extremely poor." They remarked that "[i]t was necessary to redirect his attention after each question [and] . . . often necessary to touch him, ask that he look at the examiner, and listen closely to maintain his compliance." Tr. 143. T.M.B.'s IQ score was in the average range of intellectual functioning, and he had a significant strength in language development and word knowledge as compared to his peers, and no significant weaknesses relative to his age group. Tr. 144. The diagnostic impression was ADHD (severe), academic and relationship problems, and a GAF of 45 for exceedingly poor attention and concentration and severe hyperactivity. Tr. 145.

On August 16, 2004, Plaintiff took T.M.B. to Dr. Bentley to inquire about changing T.M.B.'s prescription from Strattera to Ritalin, and Dr. Bentley agreed to the change and placed T.M.B. on Ritalin. Tr. 166. Two weeks later T.M.B. was taken to see Dr. Bentley about the possibility of adding an afternoon dosage of Ritalin because his teacher reported that he did very well in the morning but he was "bouncing off [the] wall by noon." Tr. 165.

A nonexamining state agency consultant, Dr. Tom Shadid, completed a Childhood Disability Evaluation Form for T.M.B. regarding ADHD on August 31, 2004. Dr. Shadid concluded that T.M.B.'s ADHD was severe, but did not meet, medically equal, or

functionally equal any listing. Tr. 147. Dr. Shadid reviewed T.M.B.'s records and, evaluating the relevant domains, found that T.M.B. had no limitation in his ability to acquire and use information, citing T.M.B.'s average intelligence as relevant to the determination. Tr. 149. As to T.M.B.'s limitations on his ability to attend and complete tasks, Dr. Shadid found them to be "less than marked"; he acknowledged T.M.B.'s need for frequent redirection, but observed that T.M.B. did better with medication. As to interacting and relating with others, Dr. Shadid rated T.M.B.'s limitation as less than marked because although T.M.B. was bossy, he still had friends. Tr. 149. Dr. Shadid assessed no limitations in T.M.B.'s ability to move about and manipulate objects, care for himself, or in his health and physical well-being. Tr. 150. Dr. R.E. Smallwood, a state agency consultant, reached the same conclusions in a Childhood Disability Evaluation Form he completed in December 2004. Tr. 156-161.

In January 2005, T.M.B. saw Dr. Bentley for a Ritalin refill. It was reported that the medication did help. Tr. 164. Dr. Bentley refilled T.M.B.'s Ritalin prescription again in May of 2005 and January 2006. Tr. 162-63. Several months later, on September 20, 2005, Plaintiff sought counseling for T.M.B. from the Northwest Center for Behavior Health because she believed T.M.B. was having difficulty dealing with the death of his grandmother, and she wanted him back on medication to treat his ADHD. Tr. 171. It was noted that Plaintiff did not bring T.M.B. to counseling on a regular basis, that she had stopped counseling without notice and that she had not responded to the "no show letter." Tr. 171. T.M.B. attended a referral appointment for psychiatric diagnostic evaluation by Dr. Kueckes

at the Northwest Center for Behavior Health on November 10, 2005. Tr. 170. Dr. Kueckes diagnosed ADHD, combined type and depressive disorder, not otherwise specified for which he prescribed increased Ritalin and Paxil. Tr. 170. Dr. Kueckes refilled T.M.B.'s Ritalin prescription in December 2005, Tr. 170, and Dr. Bentley refilled it in January 2006. Tr. 162.

A counselor at the Northwest Center for Behavior Health released T.M.B. from care on April 14, 2006, with a diagnosis of ADHD, combined type, current and highest in the past year GAF score of 60,[3] and a prognosis described as "[p]oor due to non-attendance of appointments." Tr. 171. T.M.B. began seeing Dr. Steen Andersen in June 2006 for a refill of his medication. Plaintiff reported that T.M.B.'s afternoon Ritalin dosage seemed to cause drowsiness for an hour or two after he took it, and Dr. Andersen decreased T.M.B.'s afternoon Ritalin dosage. Tr. 169. T.M.B.'s prescriptions for Ritalin were refilled by Dr. Andersen in July 2006. Tr. 169. Dr. Andersen saw T.M.B. again on September 6, 2006, because of Plaintiff's desire to re-start T.M.B. on Paxil for depression. Tr. 168. The following day, Dr. Andersen executed a form provided by a social security claimant's representative wherein he indicated that T.M.B. had "marked" limitations in his ability to acquire and use information, "marked" limitations in his ability to attend and complete tasks, "less than marked" limitations on his ability to integrate and relate with others, ability to move about and manipulate objects, and care for himself, and no limitations on his health and

---

[3] A GAF score of 51-60 indicates "moderate symptoms," such as a flat affect, or "moderate difficulty in social or occupational functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000) at 34.

physical well-being. Tr. 176-78. Thus, Dr. Andersen opined that T.M.B.'s impairments functionally equaled a listing. Tr. 178. Dr. Andersen submitted a similar form to the Appeals Council that he executed in March 2007. Tr. 179-181. On this form however, he explained his conclusion that T.M.B. had "marked" limitations on his ability to acquire and use information by stating that T.M.B. had an impaired ability to learn and retain information, and his conclusion that T.M.B. had "marked" limitations in his ability to attend and complete tasks by stating that T.M.B. had an inability to concentrate and focus. Tr. 179.

The administrative record also contains information pertaining to T.M.B.'s ADHD and its effects upon him at day care, school, and at home. In November 2003, T.M.B.'s kindergarten teacher, Tamra Hall, completed a questionnaire from Dr. Settle and stated "[y]ou can definitely tell when [T.M.B.] has not had his medication. He is a totally different child." Tr. 125. She concluded that T.M.B. "occasionally" displayed various delineated symptoms of ADHD, and rated his academic and classroom behavioral performance as "average." Tr. 124-25. T.M.B.'s day care provider, Ashley Harper, completed the same survey and concluded that T.M.B. "occasionally" and "often" displayed various symptoms of ADHD, and rated him as "somewhat of a problem" in terms of classroom behavioral performance. Tr. 122-23. At the end of his kindergarten year in May 2004, it was recommended that T.M.B. be placed in a transitional first grade program. Tr. 94. T.M.B.'s teachers expressed concern about T.M.B.'s efforts in completing his work and noted that he had difficulty concentrating. Tr. 94. T.M.B.'s teachers also commented that he had a moderate level of motivation and he "has good and bad days." Tr. 94. They also expressed

concern with his ability to meet grade level standards if promoted to first grade because although he was very smart, he "can not get his work finished." They also believed his behavior was developmentally young given his age as he had a "short attention span & plays with younger children." Tr. 94.

In July 2004, T.M.B.'s day care teacher, Velinda Matthews, completed a School Activity Report wherein she remarked that T.M.B. was "very im[m]ature" even though he was academically comparable to his peers. Tr. 73. She characterized his behavior toward adults as "very friendly & loving" and, with respect to getting along with other students, opined that T.M.B. "gets along with others great," noting that T.M.B.'s "friends" did "whatever [T.M.B.] tells them to do." Tr. 73. When asked to identify difficulties T.M.B. had with his ordinary school routine, Ms. Matthews commented that T.M.B. needed constant instructions, talked excessively, was very disruptive during reading time, nap time, and lunch, and disobeyed his teachers' requests to sit still and be quiet. Tr. 74-74A.

In April 2006, T.M.B.'s first grade teacher, Stephanie Babb, completed a Teacher Questionnaire. She identified no problems concerning T.M.B.'s ability to acquire and use information. Tr. 101-102. As to attending and completing tasks, Ms. Babb remarked that T.M.B. had no problems if he was taking his medication; however, when T.M.B. was not taking medication, she reported he had problems daily in numerous activities such as sustaining attention, changing from one activity without being disruptive, and working at a reasonable pace/finishing on time. Tr. 103. In terms of interacting and relating with others, Ms. Babb opined that T.M.B. had no problems in this area when taking medication. Tr. 104.

When not medicated however, she remarked that T.M.B. was "out of control" and noted that he had daily problems with several activities such as playing cooperatively, following rules, and taking turns. She also remarked that it was necessary to implement behavior modification strategies with T.M.B. during the times when he was not taking medication. Tr. 104. Ms. Babb observed no problems with T.M.B.'s ability to move about and manipulate objects. Tr. 105. However, without medication, Ms. Babb indicated that T.M.B. had slight problems caring for himself. Tr. 106. Ms. Babb also opined that T.M.B. is very enjoyable when he has taken his medication and remarked that Plaintiff "forgets to refill his med[ication]" which causes [T.M.B.] to go days without them. She further stated that if T.M.B.'s "mom could keep him on 1 kind of med[ication] [and] let him never run out, [T.M.B.] would really enjoy school and himself[.]" Tr. 107.

In September 2006, T.M.B.'s teacher, Michelle Sanford, completed a Teacher Questionnaire. Tr. 110-117. She indicated that T.M.B. had no limitations in acquiring and using information, attending and completing tasks, interacting and relating with others, caring for himself, moving about and manipulating objects, or with medical conditions and medications/health and physical well being. Tr. 111-16.

## VII.  DISCUSSION

Plaintiff's first point on appeal necessitates reversal of the Commissioner's decision and a remand for further proceedings. In connection with this claim, Plaintiff argues that the administrative law judge erred as a matter of law by failing to properly explain his finding that T.M.B.'s ADHD did not meet, or medically or functionally equal the criteria for the

applicable listing. Plaintiff's Opening Brief, p. 13. Specifically, she contends that the administrative law judge's discussion of the relevant listing was conclusory and did not discuss the pertinent evidence or link the administrative law judge's findings to evidence within the record. Id. at 15-16.

In response, the Commissioner ignores Plaintiff's argument that the administrative law judge committed a legal error in discussing the applicable listing, and instead contends that the decision should be affirmed because the administrative law judge's decision is supported by substantial evidence, and because the administrative law judge identified the relevant listing in the decision. Response Brief, pp. 5-6. In reply, Plaintiff reiterates her position that the administrative law judge committed a legal error, rather than one involving a lack of substantial evidence, which requires reversal based upon the administrative law judge's failure to follow the correct legal standards. Reply, p. 2. Plaintiff also contends that the Commissioner's arguments are a *post hoc* justification for the administrative law judge's actions because they do not explain how, in the decision, the administrative law judge demonstrated that he was following correct legal standards. Id. at 3.

The listing at issue in the decision sets forth the criteria a claimant must meet in order to be considered presumptively disabled:

> 112.11 *Attention Deficit Hyperactivity Disorder:* Manifested by developmentally inappropriate degrees of inattention, impulsiveness, and hyperactivity.
>
> 1. The required level of severity for these disorders is met when the requirements in both A and B are satisfied.

    A. Medically documented findings of all three of the following:

    1. Marked inattention; and
    2. Marked impulsiveness; and
    3. Marked hyperactivity;

    AND

    B. For older infants and toddlers (age 1 to attainment of age 3), resulting in at least one of the appropriate age-group criteria in paragraph B1 of 112.02; or, for children (age 3 to attainment of age 18), resulting in at least two of the appropriate age-group criteria in paragraph B2 of 112.02.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.11.  The "appropriate age-group criteria" in paragraph B(2) of § 112.02 are:

    a. Marked impairment in age-appropriate cognitive/communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests, or for children under age 6, by appropriate tests of language and communication; or

    b. Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or

    c. Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or

    d. Marked difficulties in maintaining concentration, persistence, or pace.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.02(B)(2).

    In rendering a decision, the Commissioner has an obligation to provide the claimant

with "a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating the Commissioner's determination and the reason or reasons upon which it is based. 42 U.S.C. § 405(b)(1). According to the Tenth Circuit, this statute requires an administrative law judge "to discuss the evidence and explain why he found that appellant was not disabled at step three." Clifton v. Chater, 79 F.3d 1007, 1009 (10th Cir. 1996).

      Here the administrative law judge concluded at step three:

> **4.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart p, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).**
>
> The undersigned has carefully reviewed section 112.11 of the listing of impairments, and concludes that the claimant falls short of satisfying listing-level severity criteria to be presumed disabled. Furthermore, the undersigned finds the opinions of State Agency physicians that the claimant's impairments neither met nor equaled the severity of listed impairments are well reasoned and supported by the evidence of record.

Tr. 18. The administrative law judge then concluded: "**5. The claimant does not have an impairment of combination of impairments that functionally equals the listings (20 CFR 416.924(d) and 416.926(a).**" Tr. 18. The administrative law judge then proceeded to discuss the evidence relevant to making this finding, particularly as it applied to the six domains. Tr. 18-26. In concluding that T.M.B. did not meet the criteria of listing 112.11, the administrative law judge failed to follow correct legal standards; this failure necessitates a remand for further proceedings.

      Specifically, the administrative law judge left the Court without findings that lend

themselves to meaningful judicial review because the administrative law judge did not discuss the criteria set forth in parts A and B of listing 112.11 pertaining to whether T.M.B. had "marked" limitations in inattention, impulsiveness or hyperactivity, and "marked" limitations in age-appropriate cognitive/communicative, social, or personal functioning, or in maintaining concentration, persistence or pace. See Tr. 18. The administrative law judge's brief discussion concerning whether T.M.B.'s ADHD met the listing criteria was nothing more than "a bare conclusion [that] is beyond meaningful judicial review, " Clifton, 79 F.3d at 1009, and did not meet the administrative law judge's obligation to "make a specific finding as to the degree of limitation in each of the functional areas" used to determine whether a claimant meets the criteria of a listing. 20 C.F.R. § 416.920a(e). Instead, the administrative law judge considered and discussed the evidence only in connection with determining whether T.M.B.'s ADHD rose to the level of functional equivalence to Listing 112.11. See Tr. 20-26. That however does not satisfy the obligation to make specific findings regarding the degree of limitation in each of the functional areas. The Tenth Circuit Court of Appeals has concluded that "the discussion of the functional equivalence domains does not serve as a substitute for the requisite analysis of the three functional areas." Smith ex. rel. E.S.D. v. Barnhart, No. 05-6006, 157 Fed. Appx. 57, 65 (Dec. 5, 2005);[4] accord Huffman ex. rel. B.H. v. Astrue, No. 07-5186, 290 Fed. Appx. 87, 89 (July 11, 2008) (rejecting Commissioner's argument that administrative law judge's

---

[4] This and any other unpublished disposition cited pursuant to Fed. R. App. P. 32.1 and Tenth Circuit Rule 32.1.

failure to make specific findings as to whether childhood claimant met listings could be saved by administrative law judge's detailed discussion of evidence in connection with evaluation the six domains of functional equivalence). In publishing final rules regarding the determination of childhood disability claims, the Commissioner explained that the "domains are specifically designed for determining functional equivalence and are *completely delinked from the mental disorders and other listings*." 65 Fed. Reg. 54747, 54755 (Sept. 11, 2000) (emphasis added). Accordingly, the administrative law judge's findings and discussion of the evidence as it pertained to the six domains cannot be substituted for his failure to make specific findings regarding the degree of limitation T.M.B. experienced in each of the functional areas used to determine whether his ADHD met the criteria of Listing 112.11. This legal error necessitates reversal.

Given this disposition of Plaintiff's first claim, the undersigned will not discuss Plaintiff's remaining points on appeal. See Watkins v. Barnhart, 350 F.3d 1297, 1299 ( 10th Cir. 2003) ("We will not reach the remaining issues raised by appellant because they may be affected by the [administrative law judge's] treatment of the case on remand.").

### **RECOMMENDATION**

Having reviewed the medical evidence of record, the transcript of the administrative hearing, the decision of the administrative law judge, and the pleadings and briefs of the parties, the undersigned Magistrate Judge finds that the administrative law judge failed to apply correct legal standards as discussed above. Accordingly, it is recommended that the final decision of the Commissioner of Social Security Administration be reversed and that

the matter be remanded for further proceedings consistent with this Report and Recommendation. The Commissioner is advised of his right to file an objection to the Report and Recommendation with the Clerk of this Court by August 4, 2009, in accordance with 28 U.S.C. § 636 and Local Civil Rule 72.1. This Report and Recommendation disposes of all issues referred to the undersigned Magistrate Judge in the captioned matter.

**DATED this 15th day of July, 2009.**

_____
DOYLE W. ARGO
UNITED STATES MAGISTRATE JUDGE